UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RED EAGLE LAW, L.C.,<br>Plaintiff,<br>v.<br>MARCO RUBIO, *in his official capacity as Secretary of State*,<br>Defendant. | Case No.: 26-cv-04738-JO-VET<br>**ORDER GRANTING MOTION FOR PRELIMINARY INJUNCTION** |

Plaintiff Red Eagle Law, L.C. brought this action against Marco Rubio, Secretary of the United States Department of State, challenging his cancellation of the 2027 Diversity Visa Program. Dkt. 1. The Immigration and Nationality Act ("INA") requires that the State Department implement a yearly program to award up to 55,000 Diversity Visas to individuals from countries with low rates of immigration to the United States. 8 U.S.C. §§ 1151(e), 1153(c). Under the INA, the first step in the process is to hold a lottery to give randomly selected individuals the opportunity to apply for one of these visas. *Id.* § 1154(a)(1); *see also* 22 C.F.R. § 42.33. Because the State Department failed to hold this lottery to select applicants for the 2027 fiscal year—thereby forestalling the annual award of 55,000 visas for individuals from these countries—Plaintiff filed an application for a temporary restraining order and a motion for preliminary injunction compelling the government to reopen the Diversity Visa Program for 2027. Dkt. 3 ("Pl.'s Mot. for TRO"); Dkt. 13 ("Pl.'s Mot. for Prelim. Inj."). The Court granted Plaintiff's preliminary injunction motion during the hearing on October 14, 2026, and issued injunctive relief ordering the

government to comply with existing immigration laws. Dkt. 23. The Court issues this written order to explain its reasoning.

# I. BACKGROUND

## A. The Diversity Visa Program

Congress created the Diversity Visa Program under the Immigration Act of 1990 to promote more immigration to the United States from countries with traditionally low rates of immigration. *See* Immigration Act of 1990, Pub. L. No. 101-649, § 131, 104 Stat. 4978, 4997–99 (1990). Through this program, Congress requires the State Department to award up to 55,000 Diversity Visas, providing a pathway to lawful permanent residency, or a "green card," for individuals from various countries such as Cameroon, Liberia, Burma, or Qatar.[1] *See* 8 U.S.C. §§ 1151(a)(3), (e), 1153(c). The State Department is responsible for administering the Diversity Visa Program annually. *See* 22 C.F.R. § 42.33. Before the start of each fiscal year,[2] it holds a lottery for applicants from qualifying countries. *See id.*; 9 Foreign Affairs Manual ("FAM") § 502.6-4. In past years, registration for the Diversity Visa lottery generally opened in early October for visas available during the following fiscal year. *See* U.S. Dep't of State, *Diversity Visa Instructions*, https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/diversity-visa-instructions.html. During the registration period, individuals register for the lottery online, and the State Department conducts a random selection of "lottery winners," subject to allocations of available visas for each region and country. *See* 8 U.S.C.

---

[1] The list of countries whose nationals are eligible for Diversity Visas may change from year to year. *See, e.g.,* U.S. Dep't of State, Bureau of Consular Affs., *Instructions for the 2026 Diversity Immigrant Visa Program (DV-2026)*, https://travel.state.gov/content/dam/visas/Diversity-Visa/DV-Instructions-Translations/DV-2026-Instructions-Translations/DV%202026%20Plain%20Language%20Instructions%20and%20FAQs.pdf (listing qualifying countries for the 2026 Diversity Visa Program).

[2] In the United States, the federal fiscal year generally begins on October 1 and ends on September 30 of the following calendar year.

§ 1153(e)(2); 22 C.F.R. § 42.33(c) (providing for random computer selection). In recent years, the State Department has randomly selected, from millions of entries, approximately 100,000 selectees to apply for a maximum of 55,000 visas. *See* Cong. Rsch. Serv., *The Diversity Immigrant Visa Program* (Oct. 15, 2019), https://www.congress.gov/crs-product/R45973. The State Department selects more individuals than the number of visas available because not every selectee will qualify for, pursue, or complete the visa process. *Id.*

Randomly selected lottery winners become eligible to apply for Diversity Visas during the fiscal year for which they are chosen, but they are not guaranteed the issuance of a visa. *See* 8 U.S.C. § 1153(e)(2); *Babamuradova v. Blinken*, 633 F.Supp.3d 1, 6 (D.D.C. 2022). In order to obtain a visa, they must demonstrate that they meet all requirements by completing the required application process. 8 U.S.C. § 1182(a). Visas may be issued until either the numerical limit of approximately 55,000 visas is reached or the fiscal year ends. *See* 8 U.S.C. § 1151(e); *Goodluck v. Biden*, 104 F.4th 920, 928 (D.C. Cir. 2024). A lottery winner who has not received a visa by that date is "out of luck"; they are not eligible to apply for the following fiscal year unless they are selected again. 8 U.S.C. § 1154(a)(1)(I)(ii)(II); 22 C.F.R. § 42.33(a)(1); *see Yung-Kai Lu v. Tillerson*, 292 F.Supp.3d 276, 282 (D.D.C. 2018) ("[W]hen midnight strikes at the end of the fiscal year, those applicants without visas are out of luck.").

**B. The Registration Period for the 2027 Diversity Visa Program**

Based on the State Department's past practices,[3] initial steps to implement the 2027 Diversity Visa Program should have begun in October or November of 2025. However, the current executive administration failed to open the lottery registration period and

---

[3] For example, the lottery registration period for the 2025 Diversity Visa Program ran from October 4, 2023 until November 7, 2023. *See* U.S. Dep't of State, *DV 2025—Selected Entrants* (May 3, 2024), https://travel.state.gov/content/travel/en/us-visas/immigrate/diversity-visa-program-entry/dv-2025-selected-entrants.html.

provided no information about when individuals interested in the 2027 Diversity Visa Program could sign up to enter the lottery. In a visa bulletin issued in October 2025, the State Department announced that the dates for the registration period would be "widely publicized in the coming months" and instructed potential applicants to check the Diversity Visa webpage over the next few months.[4] The State Department then subsequently updated its website with the following announcement on November 5, 2025:

> The Department is implementing certain changes to the Diversity Visa (DV) entry process. We will announce the start date for the DV-2027 registration period as soon as practicable, as well as the date that DV-2027 selection results may become available through the Entry Status Check (ESC). These changes will not affect the visa application period for individuals selected for DV-2027, which will remain October 1, 2026, to September 30, 2027.

U.S. Dep't of State, *Changes to Entry Period for 2027 Diversity Visa (DV) Program* (Nov. 5, 2025), https://travel.state.gov/content/travel/en/News/visas-news/changes-to-2027-dv-program-entry-period.html. Without announcing any change in plans, the State Department has still—almost a year later—done nothing. Its failure to open the lottery registration period for fiscal year 2027 has effectively canceled the 2027 Diversity Visa Program. Without the lottery, no applicants can apply for the approximately 55,000 visas allocated by the INA for fiscal year 2027, which began October 1, 2026. *See* 8 U.S.C. § 1151(e).

**C. Plaintiff's Claims**

Plaintiff Red Eagle is an immigration law firm whose practice includes assisting clients with applying for Diversity Visas. Pl.'s Mot. for Prelim. Inj. at 11. Plaintiff states that it has represented several hundred Diversity Visa selectees since its founding in 2023 and, for the past three years, has derived anywhere from 7% to 29% of its business revenue from assisting clients interested in the Diversity Visa Program. *Id.* at 11, 12; Compl. ¶ 9;

---

[4] *See* U.S. Dep't of State, *Visa Bulletin for November 2025*, Vol. XI, No. 8 (Nov. 2025), https://travel.state.gov/content/dam/visas/Bulletins/visabulletin_November2025.pdf.

Dkt. 13-1, Curtis Morrison Decl. ¶ 2, Ex. A. Plaintiff asserts that the suspension of the Diversity Visa Program has deprived it of this work and placed it in "dire financial condition." Pl.'s Mot. for TRO at 6. The firm also provides legal services unrelated to Diversity Visas, including assistance with naturalization, applications for advance parole, and adjustment of status to lawful permanent residency. *See* Red Eagle Law, *Our Services*, https://redeaglelaw.com/our-services.

Based on the above facts, Plaintiff brought suit against the State Department, characterizing its refusal to open the lottery registration period for the 2027 Diversity Visa Program as the executive's attempt to "effectively bar legal avenues of immigration" in violation of existing laws. Compl. ¶¶ 20, 45. Plaintiff asserts the following three claims arising from the State Department's suspension of the registration period: (1) arbitrary and capricious agency action under the Administrative Procedure Act ("APA"), (2) agency action unlawfully withheld under the APA, and (3) ultra vires agency action.[5] Compl. ¶¶ 29–45; Pl.'s Mot. for Prelim. Inj. at 14–16.

## II. LEGAL STANDARD

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *accord Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir. 2012). "A party can obtain a preliminary injunction by showing that (1) it is 'likely to succeed on the merits,' (2) it is 'likely to suffer irreparable harm in the absence of preliminary relief,' (3) 'the balance of equities tips in [its] favor,' and (4) 'an injunction is in the public interest.'" *Disney Enters., Inc. v. VidAngel, Inc.*, 869 F.3d 848, 856 (9th Cir. 2017) (alteration in original) (quoting *Winter*, 555 U.S. at 20); *accord Chamber of Com. of the U.S. v. Bonta*, 62 F.4th 473, 481 (9th Cir. 2023). The moving party bears the burden of proving these elements. *Klein v. City of San Clemente*, 584 F.3d 1196, 1201 (9th Cir. 2009).

---

[5] Plaintiff raised its claim for withholding of agency action in its motion for a preliminary injunction but did not plead it in its complaint. *See* Pl.'s Mot. for Prelim. Inj. at 14–15.

## III. DISCUSSION

Plaintiff brings this action under the APA, arguing that the State Department's cancellation of the 2027 Diversity Visa Program interferes with its ability to represent Diversity Visa applicants and causes it economic injury. Pl.'s Mot. for Prelim. Inj. at 16–17. Before addressing the merits of Plaintiff's request for a preliminary injunction, the Court will first consider whether Plaintiff has Article III standing to bring suit based on its loss of prospective clients. It will then consider another threshold requirement for APA claims—whether Plaintiff's interest in legally representing Diversity Visa applicants falls within the zone of interests that motivated the Diversity Visa Program. The Court will then address whether Plaintiff meets the requirements for injunctive relief and, finally, whether injunctive relief to reinstitute the 2027 Diversity Visa Program is appropriate even though the lottery registration period should already have taken place.

### A. Article III Standing

First, the Court considers whether Plaintiff's loss of clients resulting from the closure of the 2027 Diversity Visa Program is sufficient to give it standing to bring this action. The standing doctrine addresses "whether the litigant is entitled to have the court decide the merits of the dispute." *Warth v. Seldin*, 422 U.S. 490, 498 (1975). To have standing, a party must establish that (1) it suffered an "injury in fact"; (2) there is a causal connection between the injury and allegedly wrongful conduct; and (3) the injury would likely be redressed by a favorable decision. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). The injury in fact must constitute "an invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical." *Id.* (citations and quotations omitted). To establish causation, the defendant's conduct does not need to be the sole source of plaintiff's injury, and "[c]ausation may be found even if there are multiple links in the chain connecting the defendant's unlawful conduct to the plaintiff's injury." *Mendia v. Garcia*, 768 F.3d 1009, 1012 (9th Cir. 2014). Where the plaintiff's theory of injury depends on the actions of some independent third party not participating in the proceedings, plaintiffs must demonstrate that "third parties will likely

react in predictable ways to" the challenged government action. *Dep't of Com. v. New York*, 588 U.S. 752, 768 (2019). Lastly, redressability means that "it is likely, as opposed to merely speculative, that [its] injury will be redressed by a favorable decision." *Friends of the Earth, Inc. v. Laidlaw Envtl. Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000). This is a "relatively modest" burden on the plaintiff. *Bennett v. Spear*, 520 U.S. 154, 171 (1997). Plaintiffs must demonstrate a "change in a legal status" and that a "practical consequence of that change would amount to a significant increase in the likelihood that the plaintiff would obtain relief that directly redresses the injury suffered." *Utah v. Evans*, 536 U.S. 452, 464 (2002).

The standing inquiry is the same for both individuals and organizations, as organizations must also "satisfy the usual standards for injury in fact, causation, and redressability that apply to individuals."[6] *FDA v. All. for Hippocratic Med.*, 602 U.S. 367, 393–94 (2024) (citing *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 378–79 (1982)); *Arizona All. for Retired Americans v. Mayes*, 186 F.4th 622, 631 (9th Cir. 2026) ("Organizations need the same standing as individuals to sue in federal courts, no more and no less."). A plaintiff seeking a preliminary injunction must clearly show—not merely allege—that it is likely to prove each element of standing. *Murthy v. Missouri*, 603 U.S. 43, 58 (2024). To meet this burden, a plaintiff may rely on allegations in the complaint

[6] The Court need not consider whether Plaintiff has established organizational standing under the diversion-of-resources theory addressed in *Alliance for Hippocratic Medicine* because Plaintiff asserts a direct economic injury. 602 U.S. at 395 (explaining that an organization establishes standing by demonstrating that the defendant's action "directly affected and interfered with [its] core business activities"). Plaintiff has demonstrated that it is in the business of providing legal services to Diversity Visa selectees and that the State Department's suspension of the 2027 Diversity Visa Program directly deprived it of opportunities to generate revenue from those services. Pl.'s Mot. for TRO at 16. Plaintiff's injury therefore arises from the loss of prospective business opportunities in an existing line of business, rather than from a voluntary diversion of resources in response to the challenged agency action.

and other evidence submitted in support of the preliminary injunction motion. *LA All. for Hum. Rts. v. Cnty. of Los Angeles*, 14 F.4th 947, 956–57 (9th Cir. 2021).

Economic injury in the form of lost customers or business revenue is sufficient to establish a concrete and particularized injury in fact for purposes of Article III standing. *Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 113–14 (2025); *United States v. Texas*, 599 U.S. 670, 676 (2023) ("Monetary costs are of course an injury."). In *Diamond Alternative Energy*, the Supreme Court held that fuel companies had standing to challenge California regulations that required automakers to manufacture more electric vehicles and fewer gasoline-powered vehicles. *Id.* at 104–05. Although California's regulations did not directly regulate the fuel companies, they asserted that they had suffered a concrete monetary injury because these regulations reduced the manufacture and sale of gasoline-powered cars, which in turn caused fewer gasoline sales, thereby adversely impacting their revenue. *Id*. The Court agreed, observing that "the decrease in purchases of gasoline and other liquid fuels resulting from the California regulations hurts [the fuel companies'] bottom line" and that these monetary costs were "'of course an injury.'" *Id.* at 114–15 (quoting *Texas*, 599 U.S. at 676). Because the regulations were designed to reduce gasoline consumption, the resulting decrease in fuel sales was a predictable economic consequence of the government's action. *Id.*

Loss of prospective clients can also constitute a concrete and particularized injury. For example, in *Isaacson v. Mayes*, the Ninth Circuit found that plaintiffs had established standing where they alleged that they lost money because the challenged law "significantly curtailed their medical practices" by preventing them from providing abortions to patients who "previously made up a significant part of [their] businesses." 84 F.4th 1089, 1094–95 (9th Cir. 2023). The Court observed that "an Article III injury in fact can arise when plaintiffs are simply prevented from conducting normal business activities," and "a loss of even a small amount of money is ordinarily an 'injury.'" *Id.* at 1096 (quoting *Czyzewski v. Jevic Holding Corp.*, 580 U.S. 451, 464 (2017)); *see Montana Shooting Sports Ass'n v. Holder*, 727 F.3d 975, 979 (9th Cir. 2013) (finding economic injury where federal firearms

regulations prevented a business from manufacturing and selling unlicensed firearms); *Nat'l Audubon Soc'y, Inc. v. Davis*, 307 F.3d 835, 856 (9th Cir. 2002) (recognizing that the trappers "suffered actual, discrete, and direct injury in fact in the form of financial losses incurred from the prohibition on trapping contained in Proposition 4"); *Wedges/Ledges of California, Inc. v. City of Phoenix*, 24 F.3d 56, 61 (9th Cir. 1994) (holding that a manufacturer had standing where government action allegedly caused "lost sales, lost profits, lost business opportunities, and other economic harms" by restricting the market for its products).

Here, Plaintiff has established a concrete injury in fact because the State Department's cancellation of the 2027 Diversity Visa Program deprives Plaintiff of prospective clients it has historically relied on to generate revenue.[7] According to Plaintiff's uncontested declarations, Plaintiff has represented an increasing number of Diversity Visa clients since its founding in 2023. Morrison Decl. ¶ 2; Dkt. 13-2, Sonya

---

[7] Separately, the State Department attacks Plaintiff's standing on the ground that it must prove that the Diversity Visa Program "exists to protect its right to bill clients for processing visa applications." Dkt. 9 ("Def.'s Opp'n to TRO") at 9; Dkt. 15 ("Def.'s Opp'n to Prelim. Inj.") at 9–11. *Diamond Alternative Energy* demonstrates that no such requirement exists for Article III standing. 606 U.S. at 114. The California regulations approved under the Clean Air Act were not meant to address the financial well-being of fuel producers. *Id.* ("The regulations likely cause fuel producers' monetary injuries because the regulations likely cause a decrease in purchases of gasoline and other liquid fuels for automobiles. Indeed, that is the whole point of the regulations."). Yet their economic losses resulting from these measures constituted sufficient injury. *Id.* Similarly, in *Isaacson v. Mayes*, the Arizona laws criminalizing the performance of certain abortions were not intended to protect the financial well-being of the physicians who challenged them. 84 F.4th at 1094. Accordingly, Plaintiff does not need to show that the INA was enacted specifically to protect its entitlement to earn legal fees in order to establish an injury in fact. That inquiry instead belongs in the zone-of-interests analysis, which is distinct from Article III standing. *Clarke*, 479 U.S. at 395; *Lexmark*, 572 U.S. at 132 ("A consumer who is hoodwinked into purchasing a disappointing product may well have an injury-in-fact cognizable under Article III, but he cannot invoke the protection of the Lanham Act[.]").

Barnard Decl. ¶¶ 5–9, Ex. B. In 2024, Plaintiff represented over 55 Diversity Visa selectees and their families in litigation, compared with over 150 in 2025 and over 1,450 selectees and derivative family members in 2026. Barnard Decl. ¶¶ 6–9. Diversity Visa representation also accounted for at least 7% of Plaintiff's revenue in 2023 and 29% of its gross revenue as of September 2026. *Id.* ¶¶ 5–10. By suspending the registration period, the State Department has prevented any individual from entering the lottery, thereby categorically foreclosing all 2027 Diversity Visa applications and eliminating a significant source of Plaintiff's revenue for that year. *See Isaacson*, 84 F.4th at 1097, n.4 (observing that "Plaintiffs previously gained revenue from abortions openly sought because of genetic abnormalities" and the elimination of this source of revenue constituted an injury in fact); *Wedges/Ledges*, 24 F.3d at 61 (stating that "a provider of goods or services has standing to challenge government regulations that directly affect its customers and restrict its market"). The absence of already-retained clients does not make Plaintiff's injury speculative, given that Plaintiff has a documented practice of providing Diversity Visa-related services and individuals may not seek legal services until they can register for the lottery. Plaintiff's injury therefore arises from the loss of an established revenue-generating business opportunity.

Plaintiff has also established a straightforward causal connection between its economic injury and the State Department's conduct: but for the suspension of the lottery registration period, individuals could enter the lottery and seek Plaintiff's assistance in applying for visas. Like the plaintiffs in *Isaacson*, Plaintiff previously generated revenue from individuals seeking Diversity Visas, but the cancellation of the 2027 Diversity Visa Program effectively prevents anyone from applying for Diversity Visas, causing Plaintiff to lose revenue from services that it can no longer provide. *See Isaacson*, 84 F.4th at 1098 ("Plaintiffs previously had generated revenue from abortions openly sought because of genetic abnormalities. The Reason Regulations now prohibit those types of abortions. Even if the Regulations were crystal clear, Plaintiffs would still lose revenue from the abortions that they can no longer provide."). Furthermore, the suspension has a predictable

effect on the behavior of these third parties, as individuals who cannot apply for Diversity Visas necessarily will not seek legal assistance with their applications. *Dep't of Com*, 588 U.S. at 768. Plaintiff's economic losses are therefore fairly traceable to the suspended Diversity Visa Program.

Finally, Plaintiff has shown that the requested injunction would redress its economic injury by restoring a meaningful opportunity to obtain the business revenue lost because of the suspension. An injunction requiring the State Department to establish a Diversity Visa registration period would remove the barrier that currently prevents individuals from entering the lottery for the 2027 Diversity Visa Program and would thereby restore the pool of prospective clients from which Plaintiff historically derives Diversity Visa-related business. *See Diamond Alternative Energy, LLC*, 606 U.S. at 117 ("Because the [fuel companies] have suffered classic monetary injury caused by a government regulatory action, it would be surprising and unusual if invalidating the regulations did not redress the fuel producers' injuries."); *Isaacson*, 84 F.4th at 1098 ("A favorable decision would relieve Plaintiffs of compliance with the law and restore the revenue generated by the prohibited procedures.").

In summary, because Plaintiff has shown that the State Department's suspension of the 2027 Diversity Visa Program caused it to lose business opportunities and the revenue they would generate, and that the restoration of this program would redress this economic harm, Plaintiff has Article III standing to seek injunctive relief.

**B. The Zone-of-Interests Test**

The Court next turns to whether Plaintiff's interest in maintaining its business revenue by continuing to represent Diversity Visa clients is within the INA's zone of interests. The Supreme Court has held that plaintiffs suing under the APA must demonstrate that their interest is "'*arguably* within the zone of interests to be protected or regulated by the statute' that he says was violated." *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 224 (2012) (quoting *Ass'n of Data Processing Serv. Orgs., Inc. v. Camp*, 397 U.S. 150, 153 (1970)) (emphasis added);

*Lexmark Intern., Inc. v. Static Control Components, Inc.,* 572 U.S. 118, 127 (2014). The zone-of-interests test is "not meant to be especially demanding," with "the benefit of any doubt go[ing] to the plaintiff." *Patchak*, 567 U.S. at 225. A plaintiff does not need to be the intended beneficiary of the statute; its interest "need only be sufficiently congruent with those of the intended beneficiaries that the litigants are not more likely to frustrate than to further the statutory objectives." *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 981 F.3d 742, 755 (9th Cir. 2020) (quotations and citation omitted); *Clarke v. Sec. Indus. Ass'n*, 479 U.S. 388, 399–400 (1987). The zone-of-interests test forecloses suit only when a plaintiff's "interests are so marginally related to or inconsistent with the purposes implicit in the statute that it cannot reasonably be assumed that Congress intended to permit the suit." *Clarke*, 479 U.S. at 399. Courts conducting this inquiry use "traditional tools of statutory interpretation" in order to determine "whether a legislatively conferred cause of action encompasses a particular plaintiff's claim." *Lexmark*, 572 U.S. at 127.

A plaintiff's economic injury is outside a statute's zone of interests if it is merely incidental to the purpose of the statute in question. In *City of Los Angeles v. County of Kern*, recyclers challenged a county ordinance banning the use of treated sewage sludge as fertilizer on local farmland, alleging that the ordinance would increase their transportation costs by forcing them to transport the sludge to alternative disposal sites outside the county. 581 F.3d 841, 848 (9th Cir. 2009). The Ninth Circuit held that their financial injury fell outside the dormant Commerce Clause's zone of interests because it did not result from a wrongful barrier to interstate commerce, which is the pivotal point of the dormant Commerce Clause. *Id.* Likewise, the Supreme Court explained in *Lexmark* that the Lanham Act prohibits false or misleading advertising to protect commercial actors participating in the marketplace against unfair competition from one another. 572 U.S. at 131. As such, while the Act protected competing businesses from false or misleading misrepresentations that injured their commercial interests in reputation and lost sales, it did not protect consumers "hoodwinked into purchasing a disappointing product," whose interests fell outside the Act's zone of interest. *Id.* at 131–32.

Even when it is not the intended beneficiary of a statute, however, a plaintiff satisfies the zone-of-interests test if its economic interests are consistent with the interests that the statute protects. *Clarke*, 479 U.S. at 399-400. In other words, the zone-of-interests test is satisfied when a plaintiff's economic injury creates a common interest with the goals of the statute or the statute's intended beneficiaries. *Port of Astoria, Oregon v. Hodel*, 595 F.2d 467 (9th Cir. 1979). For example, in *Port of Astoria, Oregon*, a broadcasting company objected to the construction of an aluminum plant nearby because its transmission lines would interfere with the company's radio broadcasts, causing it financial harm. *Id.* at 476. The Court held that the broadcasting company's economic injury fell within NEPA's zone of interests because its interest in opposing the plant's construction aligned with NEPA's environmental objectives in protecting against harmful construction. *Id*. The company and the statute thus "share[d] a common interest" and goal in opposing the plant's proposed construction. *Id.* By contrast, the Port of Astoria favored the construction of the plant in its county and opposed its relocation to a different county because it anticipated increased tax revenues and other economic benefits from the plant's presence, including financial support for the purchase of a new dock facility. *Id.* at 475. The Ninth Circuit concluded that these economic injuries fell outside NEPA's zone of interests because they resulted from the loss of anticipated financial benefits from having the plant built nearby, rather than any environmental harm associated with the plant's construction. *Id.*; *see also Solar Energy Indus. Ass'n v. Fed. Energy Regul. Comm'n*, 80 F.4th 956, 990–91 (9th Cir. 2023) (explaining that a plaintiff may satisfy NEPA's zone-of-interests requirement where its interest is primarily economic if it also alleges an environmental interest or an economic injury causally related to an interest within NEPA's protection).

In the immigration context, the Ninth Circuit has similarly affirmed that plaintiffs who are not directly regulated or benefited by a statute may nevertheless satisfy the zone-of-interests test if they share a common or consistent interest with the statute's intended beneficiaries. *City & Cnty. of San Francisco*, 981 F.3d at 755. In *City & County of San Francisco*, the Ninth Circuit held that states and municipalities could challenge a federal

regulation that would strip noncitizens' access to federal healthcare, food, and housing benefits. *Id.* at 755. The states and municipalities brought suit, arguing that they would suffer financial harm because denying noncitizens these federal benefits would increase their demand for state and local assistance programs. *Id.* at 754. Noting that the INA's overall purpose was to promote noncitizens' self-sufficiency, the Court reasoned that the plaintiffs' interest in preserving noncitizens' access to better healthcare, nutrition, and supplemental housing benefits was consistent with precisely that purpose: access to such benefits could help noncitizens establish and ultimately support themselves in the long term. *Id.* at 755. The plaintiffs' interest therefore fell within the zone of interests protected by the INA. *Id.* Similarly, in *Hawaii v. Trump*, the State of Hawaii challenged an executive order restricting the entry of nationals from six predominantly Muslim countries, arguing that the restrictions would interfere with its ability to recruit international students and faculty at the University of Hawaii, a public university operated by the State. 859 F.3d 741, 763–64 (9th Cir. 2017), *vacated on other grounds by Trump v. Hawaii*, 583 U.S. 941 (2017). The Ninth Circuit held that the State's interest in enrolling international students and hiring international faculty fell within the INA's zone of interests because the INA expressly provides for the admission of foreign nationals seeking to study, teach, or conduct research in the United States. *Id.* at 766. In *East Bay Sanctuary Covenant v. Trump*, the Ninth Circuit also held that nonprofit organizations providing legal assistance to asylum seekers fell within the INA's zone of interests because their interests in assisting asylum seekers were consistent with the INA's purpose of granting asylum for eligible noncitizens, and Congress had expressly recognized the role of legal service providers in that process. 932 F.3d 742, 768–69 (9th Cir. 2018).

For these reasons, courts have held that suits brought by for-profit organizations fall within the INA's zone of interests when they have identified a close relationship between an organization's commercial interests and the objective of the relevant immigration provision. *See, e.g., CSL Plasma Inc. v. U.S. Customs & Border Prot.*, 33 F.4th 584, 589–91 (D.C. Cir. 2022) (holding that plasma companies' economic interest in purchasing

plasma from Mexican nationals entering on B-1 visas fell within the INA's zone of interests because it aligned with the B-1 visa classification's objective of benefiting American businesses by allowing foreign nationals to enter the United States temporarily to conduct business); *V. Real Estate Group, Inc. v. U.S. Citizenship & Immigr. Servs.*, 85 F. Supp. 3d 1200, 1209 (D. Nev. 2015) (holding that a company's economic interest in recruiting Chinese investors to establish businesses in Nevada fell within the INA's zone of interests because it aligned with the statute's objective of promoting economic growth through foreign investment, as the company had developed a business model specifically designed to attract foreign investors and facilitate their investments in American businesses).

Plaintiff's interest in reopening the Diversity Visa Program, even if driven by financial motives, aligns with both the statute's goal of issuing visas through this program and the interests of those individuals seeking this immigration opportunity. Congress established the Diversity Visa Program with the goal of promoting and facilitating immigration from historically underrepresented countries. 8 U.S.C. § 1153(c). The statute's intended beneficiaries are individuals from those countries who seek the opportunity to enter the lottery and, if selected, pursue Diversity Visas. *Id.* § 1154(a)(1)(I). Their interests therefore depend on the continued operation of the annual Diversity Visa Program. Likewise, Plaintiff's economic interest in representing Diversity Visa applicants depends on reopening the same program through which those individuals seek to immigrate to the United States. Although Plaintiff is not itself directly benefited or regulated by the INA, its legal services facilitate the efforts of the very individuals whose immigration the statute is designed to promote. As in *East Bay*, where the Ninth Circuit held that nonprofit advocacy groups' interests in assisting asylum seekers were consistent with the INA's purpose in providing a framework for granting asylum, Plaintiff's interest in providing legal representation is closely connected to and promotes the INA's purpose of providing visas to nationals of underrepresented countries and thereby diversifying immigration to the United States. *See East Bay*, 932 F.3d at 768–69. Thus, Plaintiff is not merely an unrelated third party alleging incidental financial injury. Its economic interest in the

continued operation of the Diversity Visa Program substantially overlaps with those of the statute's intended beneficiaries and therefore falls within the INA's zone of interests.

Contrary to the State Department's argument, the fact that the statutory provisions governing the Diversity Visa Program do not expressly mention legal service providers does not prevent Plaintiff from meeting the zone-of-interests test. *See Clarke*, 479 U.S. at 399–400 (observing that "there need be no indication of congressional purpose to benefit the would-be plaintiff"). In *East Bay*, the Ninth Circuit recognized that Congress, throughout the INA, generally contemplated a role for legal service providers in helping noncitizens navigate the immigration process. 932 F.3d at 768–69 (citing 8 U.S.C. §§ 1228(a)(2), 1228(b)(4)(B), 1229(a)(1), 1229(b)(2), 1443(h)). For example, the INA requires the government to advise asylum applicants of their right to counsel and provide them with a list of pro bono attorneys. 8 U.S.C. § 1158(d)(4)(A)–(B). Other provisions require government officials to refer victims of trafficking and certain crimes to non-governmental organizations for assistance and recognize the right to counsel in removal proceedings. *Id.* §§ 1101(i)(1), 1184(p)(3)(A), 1362. Although the Diversity Visa provisions do not expressly recognize the role of immigration law firms, the INA more broadly contemplates a role for legal service providers in assisting noncitizens pursuing immigration benefits. *Id.* The INA's recognition of this role further supports the conclusion that Plaintiff's interest in reopening the Diversity Visa Program aligns with that of prospective applicants, as Plaintiff provides legal assistance to the very individuals the program was designed to benefit.

**C. Likelihood of Success on the Merits**

Because Plaintiff has satisfied the threshold requirements of standing and zone of interests, the Court next considers whether the *Winter* factors—likelihood of success on the merits, likelihood of irreparable harm, the balance of equities, and the public interest—militate in favor of preliminary relief.

**1. Likelihood of Success on an Arbitrary-and-Capricious Claim**[8]

The State Department's cancellation of the 2027 Diversity Visa Program was arbitrary and capricious because it has provided no reason for its action, much less a reasoned one. Under § 706(2)(A) of the APA, a reviewing court may set aside an agency action that is "'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"[9] *Ctr. for Envtl. Law & Policy v. U.S. Bureau of Reclamation*, 655 F.3d 1000, 1005 (9th Cir. 2011) (quoting 5 U.S.C. § 706(2)(A)). An action is arbitrary and capricious if "the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). "[T]he agency must examine the relevant data and articulate a satisfactory explanation for its action including a 'rational connection between the facts found and the choice made.'" *Id.* (quoting *Burlington Truck Lines v. United States*, 371 U.S. 156, 168 (1962)). When an agency changes its position, it must "assess whether there [are] reliance interests, determine whether they [are] significant, and weigh any such interests against competing policy concerns." *DHS v. Regents of the Univ. of Cal.*, 591 U.S. 1, 32–33 (2020).

---

[8] Because it concludes that Plaintiff is likely to succeed on its arbitrary-and-capricious claim, the Court declines to address Plaintiff's withholding claim and its ultra vires claim, as Plaintiff seeks the same relief under both theories. *See California*, 963 F.3d at 941 n.12 (declining to address an alternative ultra vires claim where plaintiffs prevailed under the APA and sought the same scope of relief under both causes of action).

[9] The State Department does not dispute that its effective cancellation of the 2027 Diversity Visa Program constitutes final agency action. *See* 5 U.S.C. § 704 ("Agency action made reviewable by statute and final agency action for which there is no other adequate remedy in a court are subject to judicial review."). Accordingly, the Court does not address that issue.

Here, the State Department does not even attempt to argue in its briefing that it has articulated a reasoned basis for its indefinite suspension of the 2027 lottery registration period. *See generally* Def.'s Opp'n to Prelim. Inj. The original announcement postponing the lottery registration period on the Department's website stated only that it would be "implementing certain changes," without any accompanying explanation.[10] U.S. Dep't of State, *Changes to Entry Period for 2027 Diversity Visa (DV) Program*, https://travel.state.gov/content/travel/en/News/visas-news/changes-to-2027-dv-program-entry-period.html (last updated Nov. 5, 2025). The State Department also offered no reason as to why the temporary postponement announced in November 2025 turned into an indefinite suspension extending into the start of fiscal year 2027—a decision that effectively canceled the 2027 Diversity Visa Program because no applicant may apply for a Diversity Visa without first registering to be selected in the lottery. Because the State Department has provided no explanation for its actions, including whether it considered the reliance interests of those affected by its decision, the Court can only conclude that its suspension of the 2027 Diversity Visa Program was arbitrary and capricious. *See Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (holding that an agency's failure to provide even a "minimal level of analysis" explaining the rational connection between the facts found and the choice made renders its action arbitrary and capricious); *Pac. Coast Fed'n of Fishermen's Associations v. U.S. Bureau of Reclamation*, 426 F.3d 1082, 1091 (9th Cir. 2005) ("It is a basic principle of administrative law that the agency must articulate the reason or reasons for its decision."); *Arrington v. Daniels*, 516 F.3d 1106, 1112–14 (9th

[10] While the State Department explained in its briefing its reasons for pausing issuance of 2025 Diversity Visas, it offered no explanation for postponing the registration period for 2027 Diversity Visas. Def.'s Opp'n to TRO at 2 (stating that the pause of Diversity Visa issuance in December 2025 "addressed the practice of issuing visas to diversity visa selectees, and is distinct from the separate, subsequent question at issue in this case—namely, the timing of the Department's announcement of the registration period for the 2027 diversity visa lottery").

Cir. 2008) (holding that an agency's failure to explain its decision to categorically exclude prisoners convicted of certain firearm-related offenses from eligibility for sentence reductions rendered its rule arbitrary and capricious).

**D. Irreparable Harm**

Having concluded that Plaintiff is likely to succeed on its claim that the State Department acted arbitrarily and capriciously in refusing to implement the 2027 Diversity Visa Program, the Court turns to whether Plaintiff is likely to suffer irreparable harm in the absence of an injunction. *Winter*, 555 U.S. at 22. This inquiry focuses on "whether the harm to Plaintiffs [i]s irreparable," rather than "the severity of the harm." *Ariz. Dream Act Coal. v. Brewer*, 757 F.3d 1053, 1068 (9th Cir. 2014); *accord Simula, Inc. v. Autoliv, Inc.*, 175 F.3d 716, 725 (9th Cir. 1999). "In order to be entitled to an injunction, [a plaintiff] must make a showing that he faces a real or immediate threat of substantial or irreparable injury." *Midgett v. Tri-Cnty. Metro. Transp. Dist. of Oregon*, 254 F.3d 846, 850 (9th Cir. 2001).

Although economic loss ordinarily does not constitute irreparable harm because a plaintiff may recover damages at the conclusion of litigation, plaintiffs cannot recover monetary damages in APA actions. *Sampson v. Murray*, 415 U.S. 61, 90 (1974); *L.A. Mem'l Coliseum Comm'n v. NFL*, 634 F.2d 1197, 1202 (9th Cir. 1980). In the APA context, therefore, economic harm may be irreparable because plaintiffs cannot recover monetary damages. *California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018); 5 U.S.C. § 702 (providing for relief "other than monetary damages"). Contrary to the State Department's contention that lost revenue cannot be irreparable harm, controlling circuit precedent establishes otherwise. Def.'s Opp'n to TRO at 15–17; *Azar*, 911 F.3d at 581. *See also Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 770–71 (10th Cir. 2010) ("Imposition of monetary damages that cannot later be recovered for reasons such as sovereign immunity constitutes irreparable injury."); *Iowa Utilities Bd. v. FCC*, 109 F.3d 418, 426 (8th Cir. 1996) ("The threat of unrecoverable economic loss, however, does qualify as irreparable harm.").

Here, Plaintiff has established that it is likely to suffer financial losses that it cannot recover through monetary damages in this APA action. The State Department's effective cancellation of the 2027 Diversity Visa Program means that Plaintiff cannot represent any clients for that fiscal year. Because the INA limits the maximum number of Diversity Visas to approximately 55,000 each fiscal year, and this numerical allotment of visas cannot be carried over into future years, the cancellation of the Diversity Visa Program for any given year necessarily means fewer Diversity Visa applicants overall. *See* 8 U.S.C. §§ 1151(e), 1154(a)(1)(I)(ii)(II). As a law firm with a substantial practice devoted to Diversity Visa representation, Plaintiff faces the loss of clients and revenue associated with the 2027 Diversity Visa Program that cannot be recovered in future years and that can only be remedied by reopening the program. Pl.'s Mot. for Prelim. Inj. at 26. *See Azar*, 911 F.3d at 581; *Novedades Y Servicios, Inc. v. Fin. Crimes Enf't Network*, 181 F.4th 961, 978 (9th Cir. 2026) (recognizing the threatened loss of prospective customers as irreparable harm). Accordingly, Plaintiff has demonstrated that, absent preliminary injunctive relief, it is likely to suffer irreparable harm in the form of lost business revenue that cannot be recovered through this action.

**E. Balance of Equities and the Public Interest**

Lastly, the Court considers whether the balance of equities and considerations of public interest tip in favor of granting Plaintiff's request to reinstate the 2027 Diversity Visa Program. In balancing the equities, courts "must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Winter*, 555 U.S. at 24 (citation omitted). The public interest inquiry "primarily addresses impact on non-parties rather than parties." *Bernhardt v. Los Angeles County*, 339 F.3d 920, 931 (9th Cir. 2003) (citation omitted). These two factors "merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "[I]t is clear that it would not be equitable or in the public's interest to allow the state ... to violate the requirements of federal law, especially when there are no adequate remedies available." *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (alteration

and ellipsis in original); *Azar*, 911 F.3d at 581 ("The public interest is served by compliance with the APA[.]"); *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016) (stating that "[t]here is generally no public interest in the perpetuation of unlawful agency action").

Because Plaintiff has established that the State Department likely violated the law in cancelling the 2027 Diversity Visa Program, both the balance of equities and the public interest tip sharply in favor of injunctive relief. Not only is the public interest served by addressing unlawful agency action and enforcing compliance with federal law, the interests of prospective 2027 Diversity Visa applicants also weigh in favor of relief. Without a registration period, otherwise eligible individuals cannot enter the lottery at all and lose any opportunity to be considered for a Diversity Visa during that fiscal year. The public interest would therefore be served here by requiring the State Department to comply with federal law and administer the Diversity Visa Program, which is intended to benefit immigrants from historically underrepresented countries.

On the other hand, the State Department will suffer no harm from being required to meet its statutory obligations. The Department offers no evidence in the record regarding administrative burdens associated with reopening the 2027 Diversity Visa Program, nor does it argue that the cost of complying with its statutory obligations is an appropriate consideration that weighs against an injunction. *See generally* Def.'s Opp'n to Prelim. Inj. The Department also has not identified any additional burdens that would arise from complying with the Court's order on an expedited basis, particularly where the need for expedited relief results from its own prolonged delay. In any event, any administrative burden that injunctive relief would place on it is greatly minimized by the fact that the State Department already has a process in place for establishing the registration period. The State Department has established a registration period for Diversity Visas every year since the program's inception, and a preliminary injunction would not require it to create any new infrastructure or implement any new processes. Both the balance of equities and the public interest therefore favor granting a preliminary injunction to Plaintiff.

**F. Injunctive Relief**[11]

Despite Plaintiff's satisfaction of the preliminary injunction requirements as set forth above, the State Department contends that the Court cannot order it to reopen the 2027 Diversity Visa Program because the first step of this process—the lottery registration period—should already have occurred. In other words, the State Department opposes Plaintiff's requested injunction under the logic that, because it violated the law regarding when the Diversity Visa Program should have begun, it is now too late for the Court to order it to administer the program at all. *See* Def.'s Opp'n to Prelim. Inj. at 26–27. The Department further asserts that an injunction to start the 2027 Diversity Visa Program would be tantamount to a nationwide injunction that exceeds this Court's authority. *Id.* at 28–30. The Court will address these concerns in turn.

**1. An Injunction to Reopen the 2027 Diversity Visa Program is Consistent with Congressional Intent**

Contrary to the State Department's argument, the Court may compel the agency to belatedly fulfill its statutory obligation to initiate the 2027 Diversity Visa Program because such relief would effectuate, rather than contravene, Congress's statutory purpose. In assessing whether injunctive relief is appropriate, courts look to the statute's language and structure to determine whether the requested remedy would further congressional intent. *See Tennessee Valley Auth. v. Hill*, 437 U.S. 153, 194 (1978) (approving an injunction

---

[11] Although the State Department previously raised laches and claim splitting, it did not renew either argument in their preliminary injunction briefing. *See* Def.'s Opp'n to TRO at 6–8; *id.* at 17–19. The Court therefore declines to address these arguments at this stage. In any event, neither appears persuasive. Any delay in Plaintiff's pursuit of relief appears attributable, at least in part, to the Department's statements that it was still considering the registration period and its representations to Plaintiff's counsel. Dkt. 13-4, Ex. D. Moreover, claim splitting does not appear applicable because parallel legal interests alone do not establish privity or bind a plaintiff to a decision reached in another case involving another plaintiff. *See, e.g., Favish v. Office of Indep. Counsel*, 217 F.3d 1168, 1171 (9th Cir. 2000) (refusing to find privity where the former and present litigants shared only "an abstract interest in enforcement" of the same legal requirement).

prohibiting completion of a nearly finished dam because Congress made clear in the Endangered Species Act that endangered species must be given highest priority); *Biodiversity Legal Found. v. Badgley*, 309 F.3d 1166, 1177 (9th Cir. 2002). In the absence of any statutory restriction, courts whose equity powers have been properly invoked have broad discretion in fashioning injunctive relief. *Porter v. Warner Holding Co.*, 328 U.S. 395, 398 (1946) ("Unless a statute in so many words, or by a necessary and inescapable inference, restricts the court's jurisdiction in equity, the full scope of that jurisdiction is to be recognized and applied.").

Courts may compel belated performance of statutory obligations when doing so would advance Congress's statutory objective, notwithstanding the agency's failure to meet prescribed timelines in the statute. For example, in *Biodiversity Legal Foundation*, the Ninth Circuit considered whether an injunction should issue for an agency's failure to comply with a deadline laid out in the Endangered Species Act ("ESA"). 309 F.3d at 1176–78. The ESA required the Fish and Wildlife Service to determine, within 12 months of receiving a request, whether a species should be added to the list of endangered or threatened species under the ESA. *Id.* at 1170. When the Secretary failed to meet these deadlines, the district court ordered belated performance of this statutory requirement. *Id.* Because Congress intended the ESA to ensure adequate protection for endangered species, the Ninth Circuit concluded that the missed deadline did not extinguish the agency's obligation to act, and the injunction compelling performance would enforce rather than contradict Congress's command. *Id.* at 1177–78; *accord Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) (explaining that if a statutory provision requiring the Federal Communications Commission to establish certain regulations within six months had been violated, then "a judicial decree under the APA requiring the prompt issuance of regulations" would be appropriate); *Sierra Pac. Indus. v. Lyng*, 866 F.2d 1099, 1111–12 (9th Cir. 1989).

Courts may not order belated performance of a statutory obligation, however, when doing so would alter the nature or scope of the benefit as defined by Congress in the statute.

*See Hedges v. Dixon Cnty.*, 150 U.S. 182, 192 (1893) ("Courts of equity can no more disregard statutory and constitutional requirements and provisions than can courts of law."); *I.N.S. v. Pangilinan*, 486 U.S. 875, 883 (1988). In *Pangilinan*, the statute in question enabled certain noncitizens who served in the U.S. military during World War II to obtain citizenship, but only if they filed naturalization petitions by December 31, 1946. *Id.* at 877–80. The Supreme Court held that courts could not order relief for Filipino veterans who satisfied the military service requirement but failed to file petitions before the statutory deadline because courts could not "create a remedy in violation" of the "explicit cutoff date" in the statute. *Id.* at 883–84 (internal citation omitted). Likewise, courts cannot order the State Department to issue Diversity Visas after the fiscal year for which applicants were selected has ended. This is because Congress expressly provided that individuals selected in the Diversity Visa lottery "shall remain eligible to receive such visa only through the end of the specific fiscal year for which they were selected." 8 U.S.C. § 1154(a)(1)(I)(ii)(II). *See Goodluck*, 104 F.4th at 925–26; *Carrillo-Gonzalez v. INS*, 353 F.3d 1077, 1079 (9th Cir. 2003).

Here, the Court concludes that ordering the State Department to open the lottery registration period would effectuate Congress's mandate to implement the 2027 Diversity Visa Program. Even though registration would occur later than the statute contemplates, nothing about the nature of the Diversity Visa Program's intended benefit to noncitizens would change. Under the injunction, the program would make available up to 55,000 Diversity Visas to individuals from historically underrepresented countries in 2027, as it is required to do by statute every year. *See* 8 U.S.C. §§ 1151(e), 1153(c)(1)(E) (discussing the allocation of Diversity Visas). Unlike in *Goodluck* or *Carillo-Gonzales*, this injunction would make no changes to the applicants' substantive eligibility for Diversity Visas—any lottery winners will still need to both apply for and receive a visa before the fiscal year ends. *Cf. Goodluck*, 104 F.4th at 925 (holding that courts could not extend the end-of-fiscal-year deadline for Diversity Visas); *Carrilo-Gonzalez*, 353 F.3d at 1079 (holding that

the immigration judge could not invoke equitable tolling to override the statutory deadline for Diversity Visas).

While the INA and its implementing regulations envisioned that the lottery registration period would take place before fiscal year 2027 began, these timing provisions serve as a means of carrying out Congress's broader objective of issuing up to 55,000 Diversity Visas each fiscal year—they are not an end in themselves.[12] Nothing in these provisions suggests that Congress intended this timing to prevent the State Department from conducting the Diversity Visa Program altogether if it failed to establish a registration period on time. Where Congress intended to impose substantive limitations on the Diversity Visa Program, it did so expressly, stating that selectees remain eligible to receive visas "only through the end" of the fiscal year for which they were selected. 8 U.S.C. § 1154(a)(1)(I)(ii)(II). By contrast, the statute affords the State Department considerable discretion over the details of the registration process, suggesting that Congress did not intend the timing of registration to constrain the issuance of Diversity Visas itself. *Id.* § 1154(a)(1)(I)(i) (authorizing the Secretary to determine "the place and time" for filing petitions through regulations and stating that a noncitizen may file only one petition "with respect to any petitioning period established"). Reading the timing provisions to prohibit belated registration would elevate this mechanism over the substantive purpose it serves, allowing the State Department's failure to conduct registration on time to eliminate an entire year of irreplaceable immigration opportunities under the Diversity Visa Program. *See, e.g.*, *Biodiversity Legal Found.*, 309 F.3d at 1177–78.

In sum, requiring the State Department to conduct belated registration would not create a new immigration program, as the State Department contends, but would merely

---

[12] 8 U.S.C. § 1154(a)(1)(I)(ii)(I) and 22 C.F.R. § 42.33(b)(4) establish the ordinary sequence between registration and visa issuance, under which registration takes place before the fiscal year for which visas are issued. Because 2027 is the fiscal year for which 2027 Diversity Visas would be issued, the lottery registration should have occurred before October 1, 2026. *See* 8 U.S.C. § 1154(a)(1)(I)(ii)(I); 22 C.F.R. § 42.33(b)(4).

compel the agency to fulfill its existing statutory obligation of operating the 2027 Diversity Visa Program. *See* Def.'s Opp'n to Prelim. Inj. at 26–27. By contrast, declining to issue injunctive relief would wreak a dramatically different result than the one intended by Congress—cancellation of its requirement that the Diversity Visa Program operate *every year* to award immigration opportunities to those from historically underrepresented countries. Accordingly, an injunction requiring the State Department to initiate the lottery registration period remains within the Court's equitable authority, notwithstanding the passage of the time in which the first step of registration ordinarily would have occurred. As neither the statute nor the regulation forecloses belated compliance, the Court declines to interpret these provisions in a manner that would allow the State Department's unlawful inaction to defeat Congress's statutory scheme.

**2. The Requested Injunction Does Not Amount to an Impermissible Nationwide Injunction**

The Department of State argues that an injunction to reopen the 2027 Diversity Visa Program would be tantamount to an impermissible universal injunction because it would necessarily provide relief to individuals who are not parties to this action. As a preliminary matter, the APA affords courts broad remedial authority upon finding unlawful agency action. For example, the scope of final relief under § 706(2) of the APA grants federal courts the authority to "hold unlawful and set aside agency action[s]" on a nationwide basis when the challenged action is held unlawful. 5 U.S.C. § 706; *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 826 (2024) (Kavanaugh, J., concurring) ("The Federal Government and the federal courts have long understood § 706(2) to authorize vacatur of unlawful agency rules . . . . "); *E. Bay Sanctuary Covenant v. Biden*, 993 F.3d 640, 681 (9th Cir. 2021) ("Because of the broad equitable relief available in APA challenges, a successful APA claim by a single individual can affect an 'entire' regulatory program.") (citation omitted), *overruled on other grounds by Arizona All. for Retired Americans*, 186 F.4th at 634. Injunctive relief under the APA is not impermissible merely because it affects nonparties, and the Supreme Court's decision in *Trump v. CASA, Inc.*

does not hold otherwise. *City & County of San Francisco v. Trump*, 897 F.3d 1225, 1244 (9th Cir. 2018). In *CASA*, the Supreme Court held that while federal courts generally lack authority to issue "universal" injunctions under the equitable power conferred by the Judiciary Act of 1789, "whether the Administrative Procedure Act authorizes federal courts to vacate federal agency action" is a distinct question. 606 U.S. 831, 841–42, 847 n.10. The Ninth Circuit has likewise confirmed that *CASA* does not narrow the scope of injunctive relief possible under the APA. *Novedades Y Servicios,* 181 F.4th at 981–82; *Nat'l TPS All. v. Noem*, 166 F.4th 739, 767 (9th Cir. 2026) (affirming nationwide vacatur of the Secretary's unlawful decisions to terminate Temporary Protected Status designations for Venezuelan nationals because relief limited to the named plaintiffs would not provide complete relief, even though vacatur also benefited nonparties), *vacated on other grounds sub nom. Mullin v. Nat'l TPS All.*, No. 26-48, 2026 WL 2976626 (U.S. Oct. 5, 2026).

Here, although the requested injunction would benefit individuals who are not parties to this action, the Court concludes that such relief is necessary to remedy Plaintiff's injury. Plaintiff is a law firm whose injury stems from the loss of business opportunities due to the State Department's cancellation of the 2027 Diversity Visa Program. To afford Plaintiff complete relief, the Court must order the State Department to reopen the 2027 Diversity Visa Program. While this would have the effect of benefiting individuals other than the immigration law firm that brought this action, "relief cannot be structured on an individual basis" here. *Nat'l TPS All. v. Noem*, 150 F.4th 1000, 1029 (2025). The State Department has not proposed, and the Court cannot identify, any narrower injunction that would adequately remedy Plaintiff's alleged harm.

The Court therefore orders the State Department to reopen the 2027 Diversity Visa Program, beginning with the lottery registration period, and to take all lawful steps necessary to administer the program as required by the INA and any relevant regulations.

## IV. CONCLUSION

For the reasons set out above, the Court GRANTS Plaintiff's motion for preliminary injunction [Dkt. 13]. The specific terms of the injunction are set forth in a separate order. *See* Dkts. 21, 23.

**IT IS SO ORDERED.**

Dated: October 19, 2026

Honorable Jinsook Ohta
United States District Judge